*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**O'Brian RODRIGUEZDEJESUS**
Gunnery Sergeant (E-7), U.S. Marine Corps
*Appellant*

**No. 202300262**

_____

Decided: 13 July 2026

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Adam M. King (motions, trial)
Benjamin B. Garcia (entry of judgment)

Sentence adjudged 18 May 2023 by a general court-martial tried at Marine Corps Base Camp Foster, Okinawa, Japan, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-3, confinement for 412 days, and a dishonorable discharge.[1]

For Appellant:
*Lieutenant Benjamin M. Cook, JAGC, USN*

---

[1] Appellant was credited with having served 232 days of pretrial confinement and 1 day of judicially ordered confinement credit.

For Appellee:
*Lieutenant Michael G. Osborn, JAGC, USN*
*Lieutenant K. Matthew Parker, JAGC, USN*

Senior Judge GROSS delivered the opinion of the Court, in which Chief
Judge DALY and Senior Judge de GROOT joined.

———————————————

**This opinion does not serve as binding precedent but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

GROSS, Senior Judge:

A panel of officer and enlisted members convicted Appellant, contrary to
his pleas, of one specification of sexual assault (a lesser included offense of
rape), one specification of domestic violence (assault consummated by a bat-
tery, a lesser included offense of strangulation), and one specification of domes-
tic violence (aggravated assault by inflicting substantial bodily harm, a lesser
included offense of aggravated assault by inflicting grievous bodily harm) in
violation of Articles 120 and 128b, Uniform Code of Military Justice (UCMJ).[2]
The charges and specifications arose out of allegations made by Appellant's
wife, Ms. Y.C.C.,[3] that Appellant had committed numerous violent offenses
upon her over the course of approximately nine months from December 2021
to August 2022. The Government initially charged Appellant with 1 specifica-
tion of rape by placing Ms. Y.C.C. in fear of death, 1 specification of sexual
assault, 1 specification of kidnapping, and 13 specifications of domestic vio-
lence. The members acquitted Appellant of all charges and specifications ex-
cept for the lesser included offenses described above.

Appellant asserts five assignments of error which we summarize as follows:
(1) the military judge abused his discretion by denying Appellant's three mo-

———

[2] 10 U.S.C. §§ 920, 928b.

[3] This opinion will refer to the victim and the minor children of Appellant and the
victim by initials. All other names besides Appellant, appellate counsel, and the mili-
tary judge are pseudonyms.

tions for mistrial; (2) trial counsel committed prosecutorial misconduct requiring reversal; (3) Appellant's conviction for sexual assault is factually and legally insufficient; (4) the military judge abused his discretion in admitting a prior consistent statement of the victim; and (5) cumulative error. Having considered the record as a whole and the pleadings of the parties, we have determined that the findings and sentence are correct in law and fact, and that no error materially prejudicial to Appellant's substantial rights occurred.[4]

## I. BACKGROUND

### A. Facts of the case

Appellant and Ms. Y.C.C. were married and lived off base near Marine Corps Air Station Iwakuni, Japan, during the time of the charged misconduct. The couple had been married for about 16 years and had two children together, A.R.C. and B.R.C. By the end of 2021, the couple's marriage had begun to deteriorate. Ms. Y.C.C. alleged that in December 2021, Appellant hit her for the first time in their relationship, shoving her and placing his hand on her neck. Ms. Y.C.C. alleged that from December 2021 through August 2022, Appellant engaged in a series of violent offenses against her. Among the allegations were several instances of strangulation, one instance in which she alleged Appellant held a knife to her throat, and one instance in which she alleged Appellant forced her into his car and drove toward a bridge threatening to commit suicide. At the time, Ms. Y.C.C. did not make a report to law enforcement for any of these allegations.

During the time period surrounding Appellant's alleged abuse, the couple separated, and Appellant moved out of the family home and into an apartment. However, Appellant still had access to the family home. Ms. Y.C.C. discovered that Appellant was engaged in an affair with Ms. Alpha, who was also married. In June of 2022, Ms. Y.C.C. went with a friend on a vacation to Korea. While on the trip, Ms. Y.C.C. met First Sergeant (1SG) Sierra, U. S. Army. The two subsequently began a relationship that included sending each other sexually explicit text messages.

On 4 August 2022, Appellant came to the family home unannounced. Ms. Y.C.C. was in the bathroom when Appellant entered the primary bedroom, and except for wearing a bra, Ms. Y.C.C. was naked. Appellant approached her and began to touch her, telling her that he wanted to be with her. Ms. Y.C.C. be-

---

[4] Articles 59 & 66, Uniform Code of Military Justice, 10 U.S.C. §§ 859, 866.

came scared because she had recently had her nipples pierced and was concerned with how Appellant would react, since he had told her he did not want her to get the piercings when they were together.

Ms. Y.C.C. told Appellant about the piercings. Appellant then became angry with Ms. Y.C.C., accusing her of having an affair. He forced her onto the bed and began breaking framed decorations in the primary bedroom. As he broke the decorations, Appellant cut himself with a picture frame. During this confrontation, Ms. Y.C.C. warned Appellant that she was considering getting a Military Protective Order (MPO), and Appellant ultimately left the bedroom.

After Appellant left the bedroom, Ms. Y.C.C. texted 1SG Sierra and told him about the confrontation she had just had with Appellant, and sent him a picture of the broken decorations along with what appeared to be blood. In response, 1SG Sierra texted back and urged Ms. Y.C.C. to report Appellant to his command and law enforcement.

Ms. Y.C.C. did not immediately contact the authorities, but returned to the bathroom and began taking a shower. While Ms. Y.C.C. was in the shower, Appellant returned and began groping her. After Appellant left her in the bathroom, he demanded her phone and started going through it. Ms. Y.C.C. was afraid that Appellant would discover her text messages with 1SG Sierra, and she quickly dressed herself.[5] After Appellant took Ms. Y.C.C.'s phone, he discovered the text messages from 1SG Sierra encouraging her to report Appellant's abuse. Having read that, Appellant became angry. He asked her "You f****** c******, are you going to report me for real?"[6] He then grabbed her by the throat and "choked" her very hard.

Ms. Y.C.C. decided at that moment that she was going to fight back because she was afraid that Appellant was going to find the sexually explicit text messages she had exchanged with 1SG Sierra. Appellant then pushed Ms. Y.C.C. to the floor and got on top of her. As Ms. Y.C.C. screamed, Appellant told her "Scream everything you want, because no one is going to hear you. . . . [T]his is your last day. I'm going to f****** kill you."[7]

Ms. Y.C.C. testified that as she and Appellant were struggling, she believed that Appellant was going to kill her. Appellant eventually got off of Ms. Y.C.C. and began going through her text messages with 1SG Sierra. When he reached the first sexually explicit text message between Ms. Y.C.C. and 1SG Sierra,

---

[5] R. at 1362.

[6] R. at 1362.

[7] R. at 1364–65.

Appellant slapped and punched Ms. Y.C.C. Appellant then continued reading the text messages, and after reading each one would continue to strike her. At one point, Appellant hit Ms. Y.C.C. in the ear, causing significant pain and hearing loss.

After reading all of the messages, Appellant said to Ms. Y.C.C. "This is how you want him to f*** you? Let me show you how he is going to f*** you."[8] Appellant then tried to call 1SG Sierra, but he did not answer. Ms. Y.C.C. then kissed Appellant and said "Let's just forget about this. Let's try again, now that you know that I have another person. . . . [y]ou finish with [Ms. Alpha]; I finish with [1SG Sierra]; and let's try again."[9] Ms. Y.C.C. testified that she said this "Because that was my only opportunity that I saw to stay alive. I was terrified that if he [continued assaulting me] that it will be my last day."[10] Ms. Y.C.C. testified that after she proposed sex and kissed Appellant, he took off her clothes.[11]

After Ms. Y.C.C. kissed Appellant, Appellant penetrated Ms. Y.C.C.'s vulva with his penis, but Ms. Y.C.C. did not respond affectionately to him. After about 2–3 minutes, Appellant stopped penetrating Ms. Y.C.C. and said, "You are not doing this because you love me. You are doing this because you are afraid that I am going to kill you."[12] Appellant then took Ms. Y.C.C.'s phone and texted SFC Sierra, "You punk, I just finished f***ing her."[13]

After discovering Appellant's text to 1SG Sierra, Ms. Y.C.C. sent him another text, telling him what had just happened. In it, she wrote

> Hey I am so sorry, this mother f***** came back when I was getting ready to leave the house and found out I was going to the base to report him. I f****** hate him, he got my phone and I forgot to Delete our last conversation from last night. He went to [sic] far this time. He got me naked and want to f*** me after he punched me. He screenshot [sic] us and now have the evidence.[14]

---

[8] R. at 1372.

[9] R. at 1382.

[10] R. at 1383.

[11] R. at 1383–84.

[12] R. at 1384.

[13] Pros. Ex. 36.

[14] Pros. Ex. 94.

## B. The investigation and trial

After Appellant left the house, Ms. Y.C.C. contacted the authorities and went to the Marine Corps Air Station Iwakuni Branch Health Clinic. At the clinic, Ms. Y.C.C. underwent a physical exam as well as a sexual assault forensic examination (SAFE). The examinations documented injuries to Ms. Y.C.C.'s face and neck, a ruptured ear drum, and the presence of DNA in Ms. Y.C.C.'s vagina that was consistent with that of Appellant. Members of law enforcement interviewed Ms. Y.C.C., and as a result of her allegations, Appellant's commanding officer ordered Appellant into pretrial confinement. The commanding officer also authorized a forensic search of Appellant's cell phone that yielded thousands of text messages between Appellant and Ms. Y.C.C. Many of these messages were in Spanish or a mix of Spanish and English.

Ms. Y.C.C. entered into an attorney-client relationship with Captain (Capt) Smith, a Marine judge advocate who was assigned as her Victims' Legal Counsel (VLC). In the course of his representation, Capt Smith contacted trial counsel, Capt Tango, to discuss Ms. Y.C.C.'s preference regarding disposition of the charges. After that conversation, Capt Smith sent Ms. Y.C.C. a text message, saying,

> I just spoke with [Capt Tango]. . . . I explained to him you had a strong desire for [the rape charge] not to be on the charge sheet. I told him it was heavily weighing on you and you did not feel right with that being on there considering your actions during the incident. I explained that this was causing a lot of guilt and we really did not want that specific charge on there.[15]

Appellant's counsel became aware of this conversation after Ms. Y.C.C. sent a screenshot of Capt Smith's text message to Appellant's father, Mr. Thomas. Accompanying that text message, Ms. Y.C.C. wrote,

> . . . one of the charges that NCIS filed I asked my lawyer to please insist that they remove it, and it is [a] rape charge. I have faith that it will be removed, because he didn't do that to me and I have never accused him of anything they [are] saying. I only told what happened in medical, and they are the ones who have given the name to each incident.[16]

---

[15] Appellant's Mot. to Attach, App'x A, Encl. 1; App. Ex. LXXXVI at 89. We granted Appellant's Motion to Attach on 18 May 2026.

[16] App. Ex. CIX.

After Mr. Thomas provided Ms. Y.C.C.'s message to Appellant, he filed a request for discovery regarding Ms. Y.C.C.'s and Capt Smith's communications with trial counsel. On 14 February 2023, Captain Tango provided trial defense counsel with a memorandum for the record (MFR), which stated that Capt Smith contacted him in September 2022 and "expressed . . . that [Ms. Y.C.C.] had concerns about testifying [regarding the sexual assault] because she felt embarrassed and guilty (or words to that effect) about what had happened."[17] Captain Tango stated that Capt Smith informed him that Ms. Y.C.C. did not want to change her preference for case disposition and that Capt Smith did not relay to him any exculpatory information.[18]

After receiving Capt Tango's MFR, the Defense did not file any motion to compel discovery or seek any other relief related to Capt Tango's communications with VLC prior to trial. In March of 2023, the Government informed the Defense that it had completed a second forensic extraction of Appellant's cell phone, but that the contents of the extraction were too voluminous to send electronically. Trial counsel made the extraction available for inspection and invited counsel to obtain a copy from the Iwakuni NCIS office. Ultimately, trial counsel sent a physical copy of the extraction to Appellant's digital forensic examiner in April 2023.

While the Defense did not make any motions relating to the issue of Ms. Y.C.C.'s text chain with her VLC, nor did the Defense file any motions relating to the forensic extraction of his phone prior to trial, the parties did litigate a motion *in limine* pursuant to Military Rule of Evidence (Mil. R. Evid.) 404(b) regarding other allegations of domestic violence and Appellant's mental health.

Trial began on 28 April 2023. After opening statements, trial counsel believed that many of the text messages contained on Appellant's phone had become relevant based on trial defense counsel's opening statement. Trial counsel then provided notice to the Defense and the military judge that the Government intended to introduce those text messages and arranged for a translator to provide certified translations. While the Defense objected to lack of notice, the military judge allowed the Government to use the text messages, subject to their admissibility under the rules of evidence.

The ensuing trial, and Ms. Y.C.C.'s testimony in particular, was not without incident or objection. At one point, as Ms. Y.C.C. was testifying about an

---

[17] App. Ex. LXXXVI at 94.

[18] App. Ex. LXXXVI at 96.

alleged incident of domestic violence that occurred in December 2022 and trying to explain Appellant's actions, she said, "He's here, you can ask him."[19] The military judge immediately stepped in *sua sponte*, instructing the members to, ". . . disregard that last comment. Wipe that completely from your minds."[20] He then admonished Ms. Y.C.C. in front of the members "Ma'am, please do not make a comment like that in the future."[21]

Ms. Y.C.C.'s examination remained contentious, and in several instances, trial counsel sought to elicit testimony from Ms. Y.C.C. regarding Appellant's demeanor, reactions, and suicidal comments or ideations, eliciting objections from defense counsel. The Government justified the admission of this evidence by claiming it was *res gestae* of the charged offenses. The military judge sustained a majority of these objections and frequently held sessions outside the presence of the members, through the use of Article 39(a) sessions to discuss them with counsel. After one such exchange in which the military judge sustained an objection relating to Appellant's desire to have group sex with Ms. Y.C.C. and another man, the military judge inquired as to what instruction the Defense was requesting. Trial defense counsel responded that the military judge didn't "need to go into what it was about . . . but to disregard the counsel's last question and the witness's answer."[22] The military judge gave the requested instruction.[23]

Trial defense counsel made three separate motions seeking either a mistrial or dismissal of the charges and specifications with prejudice. The Defense claimed, in part, that the Government was intentionally eliciting inadmissible information and trying to delay the trial. For the first, the military judge found that while there were delays in the presentation of the evidence, much of the delay was due to the Government's misapplication of the *res gestae* doctrine, the evidentiary errors were not intentional, and curative instructions were the appropriate way to handle the missteps that had precipitated the mistrial motion.[24]

---

[19] R. at 1035.

[20] R. at 1035.

[21] R. at 1035.

[22] R. at 1379.

[23] R. at 1380.

[24] R. at 1099–1108.

The second motion was premised largely on the prosecution's elicitation of impermissible evidence combined with what the Defense alleged were purposeful delay tactics by the Government. However, the military judge again found that the drastic remedies of a mistrial or dismissal with prejudice were not the appropriate remedies. He noted that while the Government could have better prepared its case, he did not believe a mistrial was warranted under the circumstances.[25]

The third motion for a mistrial was precipitated when Ms. Y.C.C. was asked to explain on redirect examination why she had not reported Appellant's domestic violence earlier. Ms. Y.C.C. included in her answer that she had told Ms. Alpha about the abuse and asked Ms. Alpha "if she was going through the same thing."[26] The military judge denied the mistrial motion but sustained the Defense objection to the answer. Later, during Ms. Alpha's testimony, the senior member of the panel proposed a question to her, asking "During your relationship with the accused, did he ever make you feel concerned for your safety?"[27] The military judge sustained the Defense objection and told the members, "I rule on matters of admissibility and I will not be able to ask that question to this witness."[28] The Defense did not request any further instruction from the military judge.

After a three-week trial, the parties gave closing arguments and the military judge instructed the panel. The members deliberated for a total of over seven hours prior to reaching findings of guilty only to the lesser included offenses of sexual assault, domestic violence (assault consummated by a battery), and domestic violence (aggravated assault by causing substantial bodily harm) relating to Appellant's attack on Ms. Y.C.C. on 4 August 2022. They acquitted Appellant of one specification of sexual assault from that day for digitally penetrating Ms. Y.C.C. and of all allegations predating 4 August 2022.

---

[25] R. at 1547.

[26] R. at 1955.

[27] App. Ex. CXXVI.

[28] R. at 2385.

## II. DISCUSSION

### A. The military judge did not err in denying Appellant's three motions for a mistrial.

#### 1. Law

"The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings."[29] The Court of Appeals for the Armed Forces (CAAF) has cautioned that "a mistrial is an unusual and disfavored remedy. It should be applied only as a last resort to protect the guarantee for a fair trial."[30] Military judges are enjoined to use extreme caution in granting a mistrial "for plain and obvious reasons."[31] "Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action, such as giving curative instructions."[32] "A curative instruction is the 'preferred' remedy for correcting error when the court members have heard inadmissible evidence, as long as the instruction is adequate to avoid prejudice to the accused."[33]

> Assessment of the probable impact of inadmissible evidence upon the court members is always difficult. Sometimes an instruction to disregard the inadmissible evidence is sufficient assurance that it will not be weighed against the accused; other times, the nature of the evidence is such that it is not likely to be erased from the minds of the court members. Each situation must be judged on its own facts.[34]

---

[29] Rule for Courts-Martial (R.C.M.) 915(a).

[30] *United States v. Short*, 77 M.J. 148, 150 (C.A.A.F. 2018) (quoting *United States v. Diaz,* 59 M.J. 79, 90 (C.A.A.F. 2003)).

[31] R.C.M. 915(a) Discussion.

[32] *Short*, 77 M.J. at 150 (quoting *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009)).

[33] *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000).

[34] *United States v. Pastor*, 8 M.J. 280, 284 (C.M.A. 1980) (citing *United States v. Krokroskia*, 13 C.M.A. 371, 373, 32 C.M.R. 373 (1962)).

"[A] mistrial is viewed as a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair."[35]

When a military judge denies a motion for mistrial, the CAAF has stated that "[a]bsent clear evidence of an abuse of discretion, this Court will not reverse a military judge's determination on a motion for mistrial."[36] As we have previously stated, "[n]o bright-line test exists to determine when there is manifest necessity to order a mistrial in a given prosecution."[37] Because the standard for granting a mistrial is very high, we generally defer to the findings of the trial court.[38]

*2. Analysis*

We find that the military judge did not abuse his discretion in denying Appellant's three mistrial motions. Both parties compare this case to *United States v. Short*, where the CAAF found that the military judge did not abuse his discretion in denying three mistrial motions despite multiple sustained objections under Mil. R. Evid. 404(b).[39] In *Short*, the CAAF held that the military judge's issuance of curative instructions and voir dire of the members were sufficient to cure any potential prejudice caused by the inadmissible testimony in a domestic violence case.[40] Appellant claims that this case presents a more egregious instance of improper testimony and less effective judicial remedies, and we should therefore distinguish *Short*. While we acknowledge that the military judge held more Article 39(a) hearings and sustained more Defense objections to matters under Military Rule of Evidence (Mil. R. Evid.) 404(b) than did the military judge in *Short*, the issue of manifest injustice cannot be decided based solely on a mathematical equation of how many objections were made and sustained.

The question is rather whether the military judge's instructions were ineffective and the character of the evidence so prejudicial that we can no longer

---

[35] *United States v. Diaz*, 59 M.J. 79, 90–91 (C.A.A.F. 2003) (quoting *United States v. Freeman*, 208 F.3d 332, 339 (1st Cir. 2000)).

[36] *Short*, 77 M.J. at 150 (citing *United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015)).

[37] *United States v. Cabrera*, 83 M.J. 562, 571 (N-M Ct. Crim. App. 2023).

[38] *Diaz*, 59 M.J. at 90.

[39] 77 M.J. at 150.

[40] *Id.* at 150–51.

be confident that the members followed the military judge's instructions. We find no prejudicial error for several reasons.

First, the military judge showed a great willingness to hold hearings outside of the presence of the members and sustain objections. He routinely instructed the members to disregard both the question and the answer. Indeed, the statement by Ms. Y.C.C. that Appellant complains of the most (when she said "[Appellant]'s here, you can ask him") drew a rebuke from the military judge in front of the members and a curative instruction without trial defense counsel even objecting.

Second, after the military judge sustained an objection regarding testimony from Ms. Y.C.C. about Appellant's behavior following the alleged domestic violence from 16 December 2021, the military judge brought the members in and issued a curative instruction directing them to disregard all of Ms. Y.C.C.'s testimony about what happened following that offense. The military judge then questioned the panel as to whether they could follow his instructions, and one member asked for clarification regarding other sustained objections. The military judge reiterated his prior rulings, and the members indicated they understood.

Although trial defense counsel was aware that the military judge was willing to engage in this level of curative instruction of the members and conduct this type of voir dire, he never requested the military judge undertake those steps again. Indeed, at one point, when the military judge offered the Defense the opportunity for a more fulsome curative instruction regarding Ms. Y.C.C.'s testimony that Appellant wanted to engage in a threesome with Ms. Y.C.C. and another man, trial defense counsel specifically disclaimed any further instruction beyond telling the members to disregard the testimony.

Despite the fact that Appellant never requested the military judge issue further instructions at trial (and affirmatively requested the military judge not further spotlight the offending testimony on one occasion), he now claims that it was manifest injustice for the military judge not to do so. We disagree. Appellant cites no authority for his proposition that a curative instruction must be a certain length, or that the military judge must conduct voir dire of the members every time he issues a curative instruction, and we know of none. As the Court of Military Appeals specifically stated in *Pastor*, instructions like the ones Appellant now complains of can be sufficient to cure the error of improperly elicited evidence.[41]

---

[41] *Pastor*, 8 M.J. at 284.

This leads us to our third reason that Appellant's argument fails. Reviewing the record of trial in its entirety, we can affirmatively state that trial counsel's elicitation of objectionable testimony (and Ms. Y.C.C.'s tendency to occasionally insert such testimony without prompting by  trial counsel) did not have an impact on Appellant's court-martial. Here, as in *Short*, the members returned mixed findings in a domestic violence case in which the Government accused Appellant of a history of domestic violence spanning almost eight months. However, unlike in *Short*, the Government here also presented evidence that tended to corroborate many of Ms. Y.C.C.'s claims of historical abuse including testimony from the couple's daughter that her mother's slippers were left on the driveway after Appellant kidnapped her,[42] a knife found where Ms. Y.C.C. claimed she dropped it after Appellant threatened her with it,[43] and text messages that correspond with the dates Ms. Y.C.C.'s allegations of abuse and could be read as apologies from Appellant to Ms. Y.C.C. for striking her.

However, even in light of this corroborative evidence, the members acquitted Appellant of all but the strongest allegations—those that immediately preceded her report. While Appellant challenges the legal and factual sufficiency of his conviction for sexual assault (which we find to be factually and legally sufficient in section C. *infra*), he makes no such challenge to the remaining domestic violence charges for the two domestic violence incidents from 4 August 2022. And we find them sufficient in light of the physical evidence including bruising, DNA evidence, and most telling, Ms. Y.C.C.'s ruptured eardrum.

Appellant claims that there is evidence that the members were unable to follow the military judge's instructions because the senior member proposed a question to Ms. Alpha inquiring whether Appellant had ever been violent with her. Appellant claims that this proposed question is evidence that the members disregarded the military judge's instruction for the members to disregard Ms. Y.C.C.'s statement that she had previously asked Ms. Alpha if she had suffered from domestic violence. As an initial matter, we are unpersuaded that this question from the panel president was based on Ms. Y.C.C.'s claim that she asked Ms. Alpha if she had experienced domestic violence.

However, even if Appellant is correct that Ms. Y.C.C.'s single reference to a question she posed to Ms. Alpha initiated this query, we disagree that this one proposed question is sufficient to overcome the general proposition that members are presumed to follow the military judge's instructions. The question came in the midst of a 3-week trial and was an isolated incident. There is

---

[42] R. at 2144.

[43] R. at 753–54.

no evidence that the members considered this statement by Ms. Y.C.C. about her question to Ms. Alpha in reaching their verdict.

These mixed findings leave us firmly convinced that the members did not judge Appellant on the basis of evidence the military judge ruled was inadmissible. Regarding the proposed question to Ms. Alpha, her testimony did not relate to the offenses for which Appellant was convicted. Rather, the findings show that the members held the Government to its burden and only convicted Appellant of those specifications they believed were proved beyond a reasonable doubt and only of those offenses for which there was direct corroborating evidence and an immediate report. This included finding Appellant guilty of only domestic violence – assault consummated by a battery when there was direct evidence of bruising near Ms. Y.C.C.'s neck but no documented evidence of petechiae or lowered blood oxygen level as the Defense argued would be present for a charge of strangulation. We therefore find, as did the CAAF in *Short*, ". . . the mixed findings, including several acquittals and convictions based on lesser included offenses, indicate the court members were capable of and did put aside the inadmissible evidence . . ."[44]

## B. Trial counsel's actions did not amount to prosecutorial misconduct requiring reversal of Appellant's convictions.

### 1. Law

"Where proper objection is entered at trial, this Court reviews alleged prosecutorial misconduct for prejudicial error."[45] "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'"[46] Just because a prosecutor commits errors or misconduct does not mean that a conviction must be overturned. Instead, courts must look to the cumulative impact of the misconduct on the rights of the accused.[47] A prosecutor can commit prosecutorial misconduct by repeatedly eliciting inadmissible evidence at trial.[48]

---

[44] *Short*, 77 M.J. at 151.

[45] *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)).

[46] *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)).

[47] *Fletcher*, 62 M.J. at 184.

[48] *Hornback*, 75 M.J. at 160 ("repeated violations of rules of evidence can constitute prosecutorial misconduct.")

In conducting our prejudice inquiry, we consider three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction."[49] The CAAF has stated that in some instances, "the third factor may so clearly favor the government that the appellant cannot demonstrate prejudice."[50] "The prosecutorial misconduct inquiry is an objective one, requiring no showing of malicious intent on behalf of the prosecutor."[51]

*2. Analysis*

Appellant claims that Capt Tango committed prosecutorial misconduct in several ways.[52] First, he repeatedly elicited objectionable testimony in front of the members, including evidence that the military judge ruled was inadmissible. Second, he was dilatory in his discovery responsibilities by providing notice of new text messages throughout the trial. Finally, Appellant claims that Capt Tango withheld evidence by failing to inform the Defense that Ms. Y.C.C. did not want Appellant to be charged with rape and used that charge against Appellant in the plea negotiation process.

We begin by noting, as the military judge did, that the Government's processing of Appellant's case certainly could have benefitted from better preparation by  trial counsel.[53] However, we see several reasons that the severity of trial counsel's conduct in this case was at least partially mitigated, and, as we will discuss below, we ultimately find that Appellant suffered no prejudice from Capt Tango's acts.

With respect to trial counsel's elicitation of testimony that was ultimately ruled inadmissible by the military judge, we first note that none of the parties benefitted from a thorough discussion of myriad pitfalls associated with using Mil. R. Evid. 404(b) in cases of alleged historic and prolonged domestic violence. Here, trial counsel provided trial defense counsel with notice of the

---

[49] *Id.* (quoting *Fletcher*, 62 M.J. at 184).

[50] *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *United States v. Halpin*, 71 M.J. 477, 481 (C.A.A.F. 2013)).

[51] *Hornback*, 75 M.J. at 160.

[52] We decline to address further Appellant's claim that Capt Tango was untruthful to the trial court when he asked to be excused from the court-martial due to a migraine headache and subsequently filed a bench brief with the trial court the following day. We will not question the integrity of trial counsel on the basis of a claim raised by Appellant at trial, rejected by the military judge, and re-asserted on appeal without any further proof of Capt Tango's alleged lack of candor.

[53] R. at 1092.

404(b) matters the Government intended to introduce at trial, and the Defense filed a motion in opposition.[54] However, the litigation on the matter was relatively brief, and the military judge did not issue a written ruling on the issue. Most importantly, the members' verdict acquitting Appellant of all historical abuse detracts from Appellant's argument that the members were improperly influenced by the precluded testimony. So even if trial counsel's actions were improper and intended to improperly sway the members, they were ineffective.

Second, we also note that the Government's discovery practices were not as efficient as could be desired, particularly with respect to the discovery of the forensic copy of the data on Appellant's phone. We recognize that the processing of the case was necessarily impacted by the fact that Appellant was placed into pretrial confinement and repeatedly declined to request a continuance. As a result, the Government was forced to perfect its investigation and prepare for trial quicker than it may have liked. While these realities may explain a delayed discovery process, they do not excuse it.

The military judge, however, found that the Government had met its notice obligations regarding the text messages, and ultimately permitted the Government to admit some, but not all, of the text messages in its case in chief, and we do not find his decision to be an abuse of discretion. Also, while Appellant now claims that trial counsel conducted a trial by ambush,[55] we are not convinced that Appellant was ambushed, or if he was, that he was prejudiced.

First, in Appellant's second motion for a mistrial, Appellant stated,

> It would seem that Trial Counsel is operating under the assumption that Defense has not yet translated and read the same 14,000 messages. Trial Counsel would be wrong. The first thing the Defense did when it received the . . . extraction was request its [Digital Forensic Examiner] to format the messages in a spreadsheet, which it then went through great pains to translate. . .[56]

We therefore reject Appellant's claim that trial counsel ambushed him with late discovery given that Appellant's position at trial was that he knew better than the Government what was contained in the forensic extraction. Further,

---

[54] The military judge determined that at trial the trial counsel also elicited additional unnoticed matters that were covered by Mil. R. Evid. 404(b). However, he determined that this was not an intentional omission by the trial counsel.

[55] Appellant's Brief at 60.

[56] App. Ex. XCIX at 14.

even if we were to accept this claim, we note that the alleged ambush was completely ineffective. The text messages Appellant claims were dumped on him at trial all related to the offenses for which Appellant was acquitted.

Finally, we address Appellant's claim that trial counsel committed misconduct by failing to inform him that the victim did not support the rape charge. Once again, we find that Appellant's complaints ring hollow when considering the record as a whole. While trial counsel certainly would be wise to create and discover a record in an instance where a victim expresses a desire for a particular charge or specification to be dismissed, the victim does not control the charging scheme. It is trial counsel's obligation to review the evidence and determine those offenses that can be proved beyond a reasonable doubt.[57]

Here, although Ms. Y.C.C. expressed guilt regarding her involvement during Appellant's sexual assault of her, there is no evidence that she ever changed her factual narrative of what Appellant did during her discussion with her VLC or trial counsel. As such, her concern regarding that specific charge and specification was not exculpatory, although it may have been mitigating. However, even if Capt Tango was required under the rules to discover this information to Appellant, his failure to do so immediately did not prejudice Appellant because Appellant learned of Ms. Y.C.C.'s views and the VLC's communication from his own father-in-law.

While Appellant now complains that trial counsel and the staff judge advocate sought to induce a plea agreement without disclosing the victim's views, the point is moot because Appellant rejected those plea overtures. To the extent that he believes that the information should have been presented to the convening authority before a referral decision was made, we note that Appellant knew of these communications before pretrial motions were litigated and never sought a new Article 32 preliminary hearing, new advice under Article 34, or a new referral decision. Finally, at trial, Appellant was armed with Ms. Y.C.C.'s communications with both her VLC and with Mr. Thomas and effectively cross-examined her on her own views as to whether she believed she was sexually assaulted. In the end, the members rejected her self-blame, just as we do. While Ms. Y.C.C. may have felt guilt for what happened on 4 August 2022, we are convinced, as were the members, that her acquiescence to sex was not made as a freely given decision, but rather out of self-preservation and to stop Appellant's violent rampage against her.

---

[57] *See Manual for Courts-Martial, United States* (2024 ed.), App'x 2.1, Disposition Guidance.

**C. The evidence is legally and factually sufficient**

*1. Law*

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[58] In conducting this analysis, "all of the evidence is to be considered in the light most favorable to the prosecution."[59]

For offenses that occurred after January 2021, the UCMJ requires that prior to this Court considering whether a conviction is factually sufficient, an appellant must make a specific showing of a deficiency of proof.[60] A general disagreement with the verdict is insufficient to meet this requirement.[61]

We follow the CAAF's analysis in *United States v. Harvey* and *United States v. Csiti* in assessing the three key components of the amended Article 66(d)(1)(B), UCMJ, factual sufficiency review: (1) Appellant's specific showing of a deficiency of proof; (2) the Court affording appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence when we weigh the evidence and determine controverted questions of fact; and (3) whether this Court is "clearly convinced that the finding of guilty was against the weight of the evidence."[62]

Further, the CAAF explained in *Harvey* that the degree of deference constituting "appropriate deference to the fact that the trial court saw and heard the witnesses" will depend on the nature of the evidence at issue.[63] The CAAF specifically stated that "when the CCA can assess documents, videos, and other objective evidence just as well as the court-martial, the CCA might determine that the appropriate deference is low."[64]

---

[58] *United States v. Turner,* 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[59] *Jackson,* 443 U.S. at 319 (internal citations omitted).

[60] Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B).

[61] *United States v. Valencia,* 85 M.J. 529, 535 (N-M. Ct. Crim. App. 2025).

[62] 85 M.J. 127 (C.A.A.F. 2024); 85 M.J. 414 (C.A.A.F. 2025).

[63] 85 M.J. at 130.

[64] *Id.* at 131.

*2. Analysis*

Appellant claims that the evidence is insufficient because the Government is required and failed to prove that Appellant had the specific intent to induce Ms. Y.C.C. to have sex with him by threatening her. Appellant also claims that the evidence shows that not only did Ms. Y.C.C. consent to the sexual act, but that she initiated it. We reject both assertions.

First, we find no persuasive authority for Appellant's claim that to prove his guilt for this offense, the Government had to show that he "contemplate[d] placing a person in fear to have sex with them; . . . propose[d] or demand[ed] sex; and the other person [complied] with that demand."[65] Indeed, the actual language of the statute states that "threatening or placing that other person in fear means a communication or action that is of sufficient consequence to cause a reasonable fear that non-compliance will result in the victim . . . being subjected to the wrongful action contemplated. . ."[66]

But even if we did find that the Government had to show that Appellant had the specific intent to threaten Ms. Y.C.C. with bodily harm to have sex with him, we find that the evidence overwhelmingly shows that this is exactly what happened. Having discovered evidence of communications of a sexual nature by his wife with another man, Appellant repeatedly hit Ms. Y.C.C., perforating her ear drum and causing bruising to her jaw and her neck. He told her that he was going to kill her before saying to her, "this is how you want him to f*** you? Let me show you how he is going to f*** you."

Terrified that she would die that day, Ms. Y.C.C. begged Appellant not to sexually assault her and she touched his face. She did this because she was terrified that if Appellant did not calm down, he would kill her. After Appellant penetrated Ms. Y.C.C.'s vulva with his penis, he stopped when she was not reacting to the penetration and proclaimed, "you're only doing this so that I don't kill you." This is a textbook description of sexual assault by threatening or placing another person in fear under Article 120(b)(1)(A). Appellant's conviction is, therefore, legally sufficient.

Further, having found that Appellant has made the requisite showing of a deficiency of proof (by virtue of the evidence that she told her father-in-law that "he did not do that to me" referring to the charge of rape), we are not clearly convinced that the verdict is contrary to the evidence. We give appropriate deference to the members at trial. Here, we afford them high deference in considering the testimony of the witnesses because they heard and saw the witnesses

---

[65] Appellant's Brief at 70.

[66] Article 120(f)(7), UCMJ, 10 U.S.C. § 920(f)(7).

testify. However, we also consider the text messages that Appellant sent from Ms. Y.C.C.'s phone, the photographs of Ms. Y.C.C.'s injuries, the fact that Ms. Y.C.C. had a perforated eardrum, and the DNA findings from the SAFE exam performed on Ms. Y.C.C., for which we afford less deference.

We are not persuaded by the fact that Ms. Y.C.C. claimed to Mr. Thomas, her father-in-law, that Appellant "did not do that" referring to the rape allegation, nor are we persuaded by her affidavit before us.[67] While Ms. Y.C.C. does claim that she "initiated the sexual contact" in her affidavit to us, nothing within that affidavit is inconsistent with her testimony at trial. It is entirely consistent with her testimony at trial that she touched Appellant's face, kissed him, and proposed sex after he threatened to kill her and after he told her he would "show her how [1SG Sierra] would f*** her." The evidence shows that Ms. Y.C.C.'s actions in acquiescing to sex with Appellant were not done independent of, but rather entirely because of Appellant's threats of bodily harm.

**D. The military judge did not err by admitting a prior consistent statement.**

*1. Law*

We review a military judge's decision to admit evidence for an abuse of discretion.[68] "[The] abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—[t]he challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[69] Military Rule of Evidence 801(d)(1)(B) permits admission of prior consistent statements made out of court in two different instances.

Regarding the first exception, the criteria for admissibility are

> (1) the declarant of the statement must testify and must be subject to cross-examination about the prior statement; (2) the statement must be consistent with the declarant's testimony; and (3) the statement must be offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying.[70]

---

[67] Appellant's Mot. to Attach, App'x A.

[68] *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)).

[69] *United States v. Hendricks*, 76 M.J. 283, 288 (C.A.A.F. 2017) (internal citation omitted).

[70] *United States v. Frost*, 79 M.J. 104, 110 (C.A.A.F. 2019).

Meanwhile, a proponent offering a prior consistent under the second exception

> must satisfy the following: (1) the declarant of the out-of-court statement must testify, (2) the declarant must be subject to cross-examination about the prior statement, (3) the statement must be consistent with the declarant's testimony, (4) the declarant's credibility as a witness must have been "attacked on another ground" other than the ones listed in M.R.E. 801(d)(1)(B)(i), and (5) the prior consistent statement must actually be relevant to rehabilitate the witness's credibility on the basis on which he or she was attacked.[71]

If a witness's testimony is attacked on only one ground, "a prior consistent statement offered to rebut that challenge may be eligible for admission under either subparagraph (B)(i) or subparagraph (B)(ii), but not both. . ."[72] However, if a witness's testimony is challenged on more than one ground (e.g. poor memory and recent fabrication), then a prior consistent statement may be admitted under both subparagraphs of the rule.[73] To be admissible as a prior consistent statement, the statement need not be verbatim to the witness's in-court testimony, but only generally consistent.[74]

### 2. Analysis

We find that the military judge did not abuse his discretion in admitting the text message from Ms. Y.C.C. to 1SG Sierra describing the sexual assault under Mil. R. Evid. 801(d)(1)(B)(i). The military judge found that the "triggering point" for Ms. Y.C.C.'s motive to fabricate was at the time that she reported Appellant's actions to medical providers and law enforcement. Therefore, the military judge found that her text message to 1SG Sierra predated her motive to fabricate and was therefore admissible. The trial counsel also argued that this text message could be admissible under Mil. R. Evid. 801(d)(1)(B)(ii), based on the Defense's impeachment of Ms. Y.C.C. on cross-examination when she told Mr. Thomas that Appellant "did not do that" in reference to the rape

---

[71] *United States v. Brown*, ___ M.J. ___, No. 25-0181, 2026 CAAF LEXIS 418, at *14 (C.A.A.F. May 12, 2026) (citing *United States v. Finch*, 79 M.J. 389, 396 (C.A.A.F. 2020)).

[72] *Id.* at *16.

[73] *Id.*

[74] *United States v. Ruiz*, 86 M.J. 75, 82 (C.A.A.F. 2025).

charge. However, the military judge did not accept the Government's proffer under that theory of admissibility.

Appellant takes issue with the military judge's finding that Ms. Y.C.C.'s text message predated her motive to fabricate and urges us to find that it was an abuse of discretion. In doing so, Appellant argues that Ms. Y.C.C. had a motive to fabricate months prior to the sexual assault, and that on 4 August 2023, Ms. Y.C.C. told 1SG Sierra that she was going to base to report Appellant's domestic violence. Appellant also claims that the text message was not consistent with Ms. Y.C.C.'s trial testimony, and that Ms. Y.C.C. was not subject to cross-examination on the statement.

We find that the text message was substantially consistent with Ms. Y.C.C.'s trial testimony. The military judge found that the text message was consistent, except for the part where Ms. Y.C.C. said that Appellant got her naked. We agree, but we also note that at one point, Ms. Y.C.C. did testify that Appellant took off her clothes. Therefore, to the extent that the military judge's finding on that issue was erroneous, it was actually by understating the consistency of the text message. Regardless, the military judge's ruling was not an abuse of discretion.

Although Appellant claims on appeal that Ms. Y.C.C. was not subject to cross-examination on the text message, we note that Ms. Y.C.C. testified and was subject to substantial cross-examination. At trial, Appellant did not challenge the admissibility of the text message on these grounds, so we find the argument waived on appeal. Even if it were not waived though, we would find that Appellant had ample opportunity to cross-examine Ms. Y.C.C. on the text message, including by recalling her to the witness stand if he so desired. The military judge permitted trial defense counsel wide latitude in cross-examining all witnesses in this case.

Additionally, we find the military judge's determination that Ms. Y.C.C.'s motive to fabricate formed when she reported the incidents to law enforcement was not clearly erroneous, and therefore, his admission of the text message was not an abuse of discretion. Although the Defense tried to tie Ms. Y.C.C.'s motive to fabricate far earlier in the alleged abuse and infidelity in the marriage between Appellant and Ms. Y.C.C., the military judge found as fact that her motive to fabricate her sexual assault allegations arose at the time that she reported what Appellant did to her at the time of her report. As the military judge is entitled to substantial deference in admitting a prior consistent statement, we will not substitute our judgement for his on this matter.

Finally, even if the military judge erred in admitting the text message to 1SG Sierra, we would find that the admission of the text message was harmless. The text message was consistent with Ms. Y.C.C.'s testimony at trial, and

her testimony was buttressed by significant corroborating evidence including Appellant's DNA in her genitalia and his admission that he "just finished f***ing" her in his text message to 1SG Sierra. Appellant's claim—that Ms. Y.C.C. consented to this sexual act free from fear of bodily harm from Appellant—is fanciful. Essentially, Appellant would have us believe that Ms. Y.C.C., having been beaten and berated by Appellant, suddenly did not fear that he would harm her and voluntarily agreed to have sex with him. This was despite the fact that all evidence showed the relationship was broken by the time Appellant confronted her in the shower. The Government's case on this specification was strong.

**E. Appellant was not denied a fair trial due to cumulative error.**

The cumulative effect of all plain errors and preserved errors is reviewed de novo.[75] "Under the cumulative-error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'"[76] We will reverse only if we find any cumulative errors to have denied the appellant a fair trial.[77]

In this case, we have presumed error for only one of Appellant's AOEs (and we found that presumed error to be harmless). As a result, the cumulative error doctrine does not apply.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[78] The findings and sentence are **AFFIRMED.**



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[75] *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (citation omitted).

[76] *Id.* (citing *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992)).

[77] *Id.* (citing *Banks*, 36 M.J. at 171).

[78] Articles 59 & 66, UCMJ.